UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____

PROVIDENCE PEDIATRIC MEDICAL
DAYCARE, INC., et al.,

                    Plaintiffs,        Civil No. 10-2799 (NLH/KMW)

v.

                                       **OPINION**

POONAM ALAIGH, et al.,

                    Defendants.

_____

**APPEARANCES:**

Angelina Montanez, Esquire
Providence Pediatric Medical DayCare, Inc.
411 Commerce Lane
West Berlin, New Jersey 08091

        *Counsel for Plaintiffs*

John J. Hoffman, Acting Attorney General of New Jersey
   by       Michael James Kennedy, Deputy Attorney General
            Kate M. Judd, Deputy Attorney General
            Brigid C. O'Neill, Deputy Attorney General
R.J. Hughes Justice Complex
P.O. Box 112
Trenton, New Jersey 08625

        *Counsel for Defendants*

**HILLMAN, District Judge:**

        Presently before the Court is the motion [Doc. No. 141] for

summary judgment filed by Defendants, Poonam Alaigh,

individually and as Commissioner of the New Jersey Department of

Health and Senior Services, New Jersey Department of Health and

Senior Services (hereafter, "DHSS"), Jennifer Velez,

individually and a Commissioner of the Department of Human
Services, the New Jersey Department of Human Services, John
Guhl, individually and as Director of the Division of Medical
Assistance and Health Services, and the Division of Medical
Assistance and Health Services (collectively, "Defendants").
The motion is opposed by Plaintiffs, Providence Pediatric
Medical Daycare, Inc. (hereafter, "Providence"), G.V., on behalf
of her minor child N.M., M.N. on behalf of her minor child Z.N.,
T.P. on behalf of her minor child J.M., A.B. on behalf of her
minor child T.B., D.L. on behalf of her minor child J.B., and
H.S. on behalf of her minor child C.T. (collectively,
"Plaintiffs").

      In general, Plaintiffs allege in this case that Defendants
violated Medicaid statutory law and the United States
Constitution by promulgating and enforcing regulations that
circumscribe services provided by Providence and received by the
Plaintiff-Children.  The Court previously denied Defendants'
motion to dismiss the complaint, noting "Defendants' general
opposition to Plaintiffs' claims rests more on the merits of
those claims, and the facts and evidence surrounding them, than
on their facial plausibility." (Op. 17, June 28, 2011.)  The
Court further noted that "a motion for summary judgment, with an
appropriate response by Plaintiffs, presents the proper occasion
for this Court to consider any evidence and reach the merits of

this case." (Id. at 19.)  The parties then proceeded through discovery, and Defendants now seek judgment in their favor on all claims asserted in the complaint.

The Court has considered the submissions of the parties and decides this matter pursuant to Fed. R. Civ. P. 78.  For the reasons that follow, Defendants' motion for summary judgment is granted in part and denied in part.

## I.   JURISDICTION

This Court has jurisdiction over Plaintiffs' federal claims under 28 U.S.C. § 1331.

## II.   BACKGROUND

### A.   Pediatric Medical Day Care in New Jersey

Pediatric medical day care (hereafter, "PMDC") is a program overseen by the New Jersey Department of Health[1] that provides medically necessary services to "technology-dependent children" or children with complex medical needs in an ambulatory care setting.  (Defs.' Statement of Material Facts Pursuant to L. Civ. R. 56.1 [Doc. No. 141-1] (hereafter, "Defs.' SOF") ¶ 3.)  A "technology-dependent child" is "a child who requires a specific class III medical device to compensate for the loss of a vital body function to avert death or further disability and ongoing

---

[1] Plaintiffs named the DHSS as a defendant, but after the filing of the complaint the department was renamed the "Department of Health."  (Defs.' SOF ¶ 3 n.1.)

skilled nursing intervention in the use of the device."
N.J.A.C. 10:166-1.2.  PMDC facilities provide services to
children who reside in the community and who, because of a
medical condition, require continuous care by a professional
nurse in a developmentally appropriate environment and whose
needs cannot be met in a regular day care or pre-school handicap
program.  (Defs.' SOF ¶ 4.)  All PMDC facilities must be
licensed by the Department of Health.  (Id.)

    If a state is a participant in Medicaid, it must have an
Early and Periodic Screening, Diagnosis, and Treatment
(hereafter, "EPSDT") program.  42 U.S.C. § 1396a.  "The EPSDT
provisions of the Medicaid statute require participating States
to provide various medical services to eligible children, and to
provide notice of the services."  Frew ex rel. Frew v. Hawkins,
540 U.S. 431, 433-34, 124 S. Ct. 899, 157 L. Ed. 2d 855 (2004).
These services include screenings, physical exams,
immunizations, vision services, dental services, hearing
services, and "[s]uch other necessary health care, diagnostic
services, treatment, and other measures . . . to correct or
ameliorate defects and physical and mental illnesses and
conditions discovered by the screening services[.]"  42 U.S.C. §
1396d(r).  Defendant Division of Medical Assistance and Health
Services, which is within Defendant New Jersey Department of
Human Services, is the State agency designated to administer the

4

New Jersey Medicaid program. (Defs.' SOF ¶ 6.) As such, EPSDT services in New Jersey are under the purview of the Department of Human Services. (Id.)

PMDC facilities may provide EPSDT services and may receive reimbursement from Medicaid for providing such services. (Defs.' SOF ¶¶ 7, 8.) If a PMDC facility participates in Medicaid, it must comply with the New Jersey regulations governing PMDC services set forth at N.J.A.C. 10:166-1.1 et seq. (Id. ¶ 8.) In addition, as noted above, PMDCs must be licensed by the New Jersey Department of Health and must comply with the licensing regulations set forth in N.J.A.C. 8:43J-1.1 et seq. (Id.)

### B.   Eligibility and Prior Authorization to Attend PMDC Facilities

PMDC services are offered to medically complex or technology dependent children from birth through the last day prior to his or her sixth birthday. See N.J.A.C. 10:166-3.1(a). Children may be referred for PMDC services by a number of sources including physicians, hospitals and the New Jersey Department of Children and Families. (Defs.' SOF ¶ 9.)

To be eligible to attend a PMDC, children must meet certain clinical eligibility requirements set forth by regulation. N.J.A.C. 10:166-3.1(b). A child's eligibility for PMDC services is currently handled by staff designated by the Department of

5

Human Services.  N.J.A.C. 10:166-3.4.  Plaintiffs contend that
prior to 2010, eligibility for pediatric medical daycare
services was determined by the staff at each individual PMDC
facility.  (Pls.' Response to Defs.' Statement of Material Facts
¶ 13.)

    **C.   Licensure of PMDC Facilities**

PMDC facilities must meet licensing standards established
by the Department of Health at N.J.A.C. 8:43J-1.1, et seq.
(Defs.' SOF ¶ 24.)  Barbara Goldman, Assistant Director of the
Certificate of Need and Health Care Facility Licensure for the
Department of Health, testified as to the process for a PMDC to
be licensed by the State.

According to Goldman, the application process begins when
an applicant submits a project narrative, including ownership
information and schematic plans, which are reviewed by Goldman's
department.  (Cert. of Michael J. Kennedy (hereafter, "Kennedy
Cert."), Ex. J at 22:16-23:21.)  If the submission gains
approval, the provider would then send a full set of
architectural plans, including duct work, piping, and air
conditioning, to the Department of Community Affairs.  (Id. at
27:5-28:4.)  Once the provider gains the next level of approval,
the provider obtains the requisite building permits and begins
building the facility.  (Id. at 28:7-14.)  Once the facility is
constructed, which could take several months or years, the

facility is inspected to ensure compliance with the licensing standards. (Id. at 30:19-31:4.) At that point, the provider submits an application for a license, as well as a licensing fee, and thereafter receives a license and approval to begin operating as a PMDC. (Id. at 22:18-23:13.) The license application and issuance of the license are thus the last steps in the application process.

### D.   2009 Rule Adoption

On November 16, 2009, the Department of Health adopted the current regulations governing PMDC providers in New Jersey. (Defs.' SOF ¶ 18.) Pursuant to these regulations, licensure of facilities was governed by N.J.A.C. 8:43J-1.1, et seq., and Medicaid reimbursement to facilities was governed by N.J.A.C. 8:86-1.1, et seq., which have since been recodified to N.J.A.C. 10:166-1.1, et seq. (Id.) During the notice and comment period for these regulations, Providence's Chief Executive Officer, Leeanna Roman Lozada, submitted multiple comments regarding the proposed regulations. (Id. ¶ 19.)

One of the regulations adopted in 2009 states that a functional assessment of Medicaid beneficiaries must consist of a detailed review of the nursing needs of the beneficiary, including "[t]he presence of moderate persistent or severe persistent asthma requiring nebulizer treatments more than twice a day and frequent medication adjustment in accordance with the

Asthma Guidelines." N.J.A.C. 10:166-3.1(b)(4)(vii). According
to Plaintiffs, DHSS representatives have interpreted this
regulation in a manner that does not account for the
fluctuations of asthma care, which purportedly creates an
environment in which a child may qualify for PMDC services one
day but may not qualify another day.

In addition to this regulation, the prior version of the
regulations had limited the maximum daily census in any PMDC
facility to twenty-seven children. (See Defs.' SOF ¶ 20.) The
new regulations similarly required PMDC facilities to maintain
an average daily census of twenty-seven. (Id.) According to
the DHSS, "[t]he purpose of this regulation is to maintain the
optimal environment for children who are medically unstable,
technologically dependent or otherwise in need of skilled
nursing because of special care needs." (Kennedy Cert., Ex. E.)
The DHSS further stated that "since pediatric day health
services facilities serve medically fragile children, the
Department feels that it is in the best clinical interests of
these children to limit the maximum daily census to 27 in
accordance with the current regulation." (Id.)

Notwithstanding the regulations, the DHSS had approved
facilities for more than twenty-seven slots. (Kennedy Cert.,
Ex. E.) However, on November 6, 2003, all licensed pediatric
day care providers were notified by correspondence sent by

8

William Conroy, Assistant Commissioner of the DHSS, that the Department had recently become aware that some providers had been issued Medicaid provider enrollment letters in excess of the twenty-seven child limit. (Defs.' SOF ¶ 31; see also Kennedy Cert., Ex. E.)  The letter stated that this was an error, and that the Department expected the providers to come into compliance with the regulation through attrition.  (Id.)

In addition, on November 3, 2003, the DHSS issued a public notice published in the New Jersey Register which imposed a moratorium on the acceptance of applications for new PMDC facilities or for expansion of existing PMDC facilities. (Defs.' SOF ¶ 28; see also Kennedy Cert., Ex. F.)  The notice indicated that the moratorium was, in part, a response to a report issued by the Office of Legislative Services, Office of the State Auditor following an audit of adult and pediatric medical day care programs.  (Defs.' SOF ¶ 29; see also Kennedy Cert., Ex. F.)  The moratorium was designed to give the Department time to address and remedy problems identified in the Audit Report, and to "promulgate regulations that prevent the proliferation of [PMDC] facilities with deficient policy practices serving medically fragile children." (Defs.' SOF ¶ 30; see also Kennedy Cert., Ex. F.)

### E.   Providence's Applications for PMDC Facilities

Providence operates several licensed PMDC facilities in New Jersey.  (Defs.' SOF ¶ 27.)  On September 23, 2003, prior to the moratorium, Providence had submitted an application to the Department seeking permission to expand its Camden facility from thirty slots to 114 slots.  (Id.)  The application, however, was returned to Providence.  (Id.)  It appears that the application was returned because the proposed facility exceeded the twenty-seven student cap.  (Kennedy Cert., Ex. D at 68:1-16.)

Providence then resubmitted the application to expand the Camden facility, as well as an application for licensure of a new facility in Berlin, New Jersey, in November 2003.  (Defs.' SOF ¶ 32.)  Although the applications were submitted under cover letter dated November 2, 2003, they were sent via overnight mail in an envelope dated November 13, 2003.  (Id. ¶ 33.)

The cover letter accompanying the application for the Berlin facility stated that the floor plans for the facility had previously been submitted to Bill Beyer, an architect at the Department of Health, on September 2, 2003.  (Cert. of Angelina Montanez (hereafter, "Montanez Cert."), Ex. C.)  The letter further states that "[t]he preliminary approval was received on September 5, 2003."  (Id.)  Beyer testified that he may have preliminarily reviewed drawings, and that such review could be conducted prior to an official application being submitted.

(Montanez Cert., Ex. F at 42:22-43:6.)  Such review was done as a "courtesy" to determine if the drawings looked presentable, but "it would have to be followed up by an official submittal to our department." (Id. at 40:13-21.)

Providence's applications were returned because they were submitted after the moratorium on applications was published. (Defs.' SOF ¶ 34.)  In addition, both applications requested approval for more than twenty-seven children per day.  (Id.)

The moratorium, entered in 2003, did not expire until 2012. (Id. ¶ 35.)  During the moratorium, licenses were issued for new or expanded PMDC facilities, but Defendants represent that the only licenses issued were for those applications that had been received by the Department before the moratorium.  (Id. ¶ 36.) In particular, Millhouse Pediatric Medical Day Care and Weisman Children's Medical Day Care at Pennsauken were issued licenses during the moratorium.  (Id.)

On November 26, 2003, attorneys for Providence submitted correspondence to the DOH asking for a hearing before the Office of Administrative Law on multiple issues.  (Defs.' SOF ¶ 37.)  On December 16, 2003, Providence submitted a second correspondence to the Department asking for a hearing in order to challenge the decision to return its November 2003 Camden application because it was submitted after the effective date of the moratorium.  (Id. ¶ 38.)  The two requests were consolidated

11

and were heard by an administrative law judge, who issued an
Initial Decision finding that the Department was not estopped
from applying the twenty-seven daily census limit or the
moratorium on the acceptance of applications for new or expanded
facilities against Providence.  (Defs.' SOF ¶ 42.)  These
findings were accepted by the Commissioner in a Final Agency
Decision.  (Id. ¶ 43.)  Providence did not appeal this
determination to the Superior Court of New Jersey, Appellate
Division.  (Id.)

**F.  Plaintiff-Children's Care at Providence**

Z.N. attended Providence's Atlantic City location for
approximately one year, until she was discharged to Weisman
Medical Daycare in September 2011. (Defs.' SOF ¶ 44.)  Z.N.'s
mother initiated the transfer to Weisman because her work
schedule changed and transportation to Providence became
problematic.  (Id.)

J.M. was a patient at Providence's Atlantic City
location.  (Id. ¶ 48.)  J.M.'s mother received a notice of
discharge from the State, but the daycare appealed the decision.
(Id. ¶ 49.)  J.M. was allowed to continue to receive services
pending the appeal.  (Id.)  His mother, however, decided to
voluntarily withdraw him from Providence because she was
unsure if he would continue to be approved.  (Id.)  She cared
for him at home before enrolling him in a regular pre-

Kindergarten class.  (Id.)  When J.M. was withdrawn from Providence, the appeal of the notice of discharge was still pending.  (Id.)

J.B. began attending Providence when she was approximately 18 months old, per the recommendation of a pediatrician. (Defs.' SOF ¶ 52.)  In December 2012, J.B.'s mother was told that she was no longer clinically eligible for Pediatric Medical Daycare Services.  (Id. ¶ 54.)  D.L. appealed this decision by writing a letter explaining why she disagreed with the denial, and also obtained paperwork from a doctor referencing J.B.'s purported need for pediatric daycare. (Id.)  The appeal was denied on February 6, 2013.  (Id.)  J.B. was eventually enrolled in Response Daycare, a regular daycare. (Id. ¶ 58.)  No deterioration in her health has been demonstrated following her discharge from Providence.  (Id.)

N.M. enrolled in Providence after it was recommended to her mother by a pediatrician.  (Id. ¶ 59.)  N.M. began attending Providence around the age of two.  (Id.)  Ultimately, N.M. graduated from Providence in August of 2011 and now attends regular school.  (Id. ¶ 61.)

C.T. enrolled in Providence at approximately 22 months old.  (Defs.' SOF ¶ 63.)  Prior to enrolling in Providence, C.T. attended Kid's Academy in Cherry Hill but left when they could no longer care for his asthma.  (Id.)  C.T. was never discharged

13

from Providence; he graduated in June of 2013.  (<u>Id.</u> ¶ 67.)
C.T. never applied to or attended another pediatric medical day
care.  (<u>Id.</u>)  After graduation from Providence, C.T. enrolled in
Ben Franklin Elementary School, a regular elementary school, for
kindergarten.  (<u>Id.</u>)

T.B. began attending Providence at about two or three
months old after being referred there by his hematologist.  (<u>Id.</u>
¶ 68.)  T.B. aged out of the Providence program at five years
old.  (<u>Id.</u> ¶ 72.)  T.B. now attends the RT Cream School, a
regular elementary school, and his medicine is administered by
the school nurse.  (<u>Id.</u>)

**G.  Plaintiffs' Complaint in this Case**

As a result of the foregoing, Plaintiffs filed a five-count
complaint alleging the following claims: failure to comply with
federal Medicaid laws (Count I), denial of equal treatment and
comparable care (Count II), failure to administer Medicaid
program efficiently and effectively (Count III), equal
protection (Count IV), and violation of due process (Count V).
The requested relief includes injunctive relief, declaratory
relief, an award of compensatory and punitive damages, and
attorneys' fees and costs.

III. <u>DISCUSSION</u>

    A.    **Standard for Summary Judgment**

Summary judgment is appropriate where the Court is satisfied that "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' . . . demonstrate the absence of a genuine issue of material fact" and that the moving party is entitled to a judgment as a matter of law. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (citing Fed. R. Civ. P. 56).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. <u>Id.</u> "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" <u>Marino v. Indus. Crating Co.</u>, 358 F.3d 241, 247 (3d Cir. 2004)(citing <u>Anderson</u>, 477 U.S. at 255, 106 S. Ct. 2505).

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact.

Celotex, 477 U.S. at 323, 106 S. Ct. 2548 ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."); see also Singletary v. Pa. Dept. of Corr., 266 F.3d 186, 192 n.2 (3d Cir. 2001) ("Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by 'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case' when the nonmoving party bears the ultimate burden of proof.")(citing Celotex, 477 U.S. at 325, 106 S. Ct. 2548).

Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Celotex, 477 U.S. at 324, 106 S. Ct. 2548. A "party opposing summary judgment 'may not rest upon the mere allegations or denials of the . . . pleading[s.]'" Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001). For "the non-moving party[ ] to prevail, [that party] must 'make a showing sufficient to establish the existence of [every] element essential to that party's case, and

16

on which that party will bear the burden of proof at trial.'"
Cooper v. Sniezek, 418 F. App'x 56, 58 (3d Cir. 2011) (citing
Celotex, 477 U.S. at 322, 106 S. Ct. 2548).  Thus, to withstand
a properly supported motion for summary judgment, the nonmoving
party must identify specific facts and affirmative evidence that
contradict those offered by the moving party.  Anderson, 477
U.S. at 257, 106 S. Ct. 2505.

**B.   Section 1983 Claims against the State**

Defendants represent that each count of the complaint is
brought under 42 U.S.C. § 1983.  (Br. in Supp. of Summ. J. on
Behalf of Defs. (hereafter, "Defs.' Br." 15.)  The first three
counts of the complaint expressly refer to Section 1983, but the
equal protection and due process claims do not specifically cite
to this statute.  To seek relief under the United States
Constitution, a plaintiff must utilize the vehicle of a claim
under 42 U.S.C. § 1983 and may not assert claims for relief
under the United States Constitution directly.  Morse v. Lower
Merion Sch. Dist., 132 F.3d 902, 906-07 (3d Cir. 1997) ("By
itself, Section 1983 does not create any rights, but provides a
remedy for violations of those rights created by the
Constitution or federal law.").  Although Plaintiff does not
directly cite Section 1983 with respect to the equal protection
and due process counts, these counts must be brought through
Section 1983.  Indeed, Plaintiffs concede that all of their

claims are asserted pursuant to Section 1983.  (Pls.' Br. in

Opp. of Defs.' Summ. J. Mot. (hereafter, "Pls.' Opp. Br.") 17.)

> Section 1983 provides, in relevant part as follows:

> > Every person who, under color of any
> > statute, ordinance, regulation, custom, or
> > usage, of any State or Territory or the
> > District of Columbia, subjects, or causes to
> > be subjected, any citizen of the United
> > States or other person within the
> > jurisdiction thereof to the deprivation of
> > any rights, privileges, or immunities
> > secured by the Constitution and laws, shall
> > be liable to the party injured in an action
> > at law, suit in equity, or other proper
> > proceeding for redress . . . [.]

42 U.S.C. § 1983.  In Will v. Mich. Dep't of State Police, 491

U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989), the

United States Supreme Court held that "[n]either a state nor its

officials acting in their official capacities are 'persons'

under § 1983."  The Supreme Court further noted, however, that

"a state official in his or her official capacity, when sued for

injunctive relief, would be a person under § 1983 because

'official-capacity actions for prospective relief are not

treated as actions against the State.'"  Id. at 71 n.10 (quoting

Kentucky v. Graham, 473 U.S. 159, 167 n.14, 105 S. Ct. 3099, 87

L. Ed. 2d 114 (1985); Ex parte Young, 209 U.S. 123, 159-60, 28

S. Ct. 441, 52 L. Ed. 714 (1908)).

> Because Plaintiffs premise each of their five claims on

Section 1983, all claims against the New Jersey DHSS, the New

Jersey Department of Human Services, and the Division of Medical
Assistance and Health Services, which is within the New Jersey
Department of Human Services, will be dismissed.  Additionally,
to the extent Plaintiffs assert claims against the three
individual defendants, Alaigh, Velez, and Guhl, in their
official capacities for monetary damages, such claims will be
dismissed.  Only those official capacity claims against Alaigh,
Velez and Guhl seeking prospective injunctive and declaratory
relief will be permitted to proceed to an analysis on the
merits.

### C.   Individual Capacity Claims Against Individual Defendants

Having dismissed all claims against the State agencies and
all claims, except for prospective injunctive and declaratory
relief, against Alaigh, Velez, and Guhl in their official
capacity, the Court turns to whether the individual defendants
are liable in their personal capacity.

Defendants assert that the claims against the individual
defendants in their personal capacity are subject to dismissal
under the doctrine of qualified immunity.  (Defs.' Br. 17-19.)
Defendants specifically argue that there is no supervisory
liability in Section 1983 suits, and that Plaintiffs fail to
establish that Alaigh, Velez and Guhl, through their own
individual actions, have violated any constitutional or

statutory rights.  (Id. at 17.)  In response, Plaintiffs contend
that the individual defendants acted intentionally by using the
moratorium as a basis to deny Providence's 2003 applications, in
purported violation of Plaintiffs' constitutional rights.
(Pls.' Opp. Br. 19-20.)  According to Plaintiffs, there are
disputed facts relevant to this issue, and they specifically
cite as an example Defendants' issuance of licenses to other
PMDC facilities during the moratorium while denying Plaintiffs'
applications during the same time period.  (Id. at 21.)

     In Ashcroft v. Iqbal, the Supreme Court held that
"[b]ecause vicarious liability is inapplicable to . . . § 1983
suits, a plaintiff must plead that each Government-official
defendant, through the official's own individual actions, has
violated the Constitution."  556 U.S. 662, 676, 129 S. Ct. 1937,
173 L. Ed. 2d 868 (2009).  "Absent vicarious liability, each
Government official, his or her title notwithstanding, is only
liable for his or her own misconduct."  Id. at 677, 129 S. Ct.
1937.

     Although Defendants raise this issue in the context of
qualified immunity, it is more appropriately addressed in the
context of the merits of Plaintiffs' claims, because individual
misconduct is necessary for liability under Section 1983.  There
is no evidence that Defendants Alaigh, Velez or Guhl, in their
roles as Commissioner of the DHSS, Commissioner of the

Department of Human Services, and Director of the Division of
Medical Assistance and Health Services, respectively, had any
role in the decision to deny Providence's 2003 applications.
Plaintiffs cite generally to their Supplemental Statement of
Disputed Facts, which purportedly "set forth circumstances in
which the individual State Defendants acted in an unfair and
disparate nature towards Providence[,]" (Pls.' Opp. Br. 21), but
Plaintiffs do not point specifically to any facts that support
this assertion.

The Court has reviewed the Supplemental Statement of Facts
and finds no evidence that the individual defendants played any
role in the denial of Plaintiff's 2003 applications.  It appears
that these defendants were only sued because of their positions,
without any facts to demonstrate individual wrongdoing.[2]  As
Plaintiffs fail to provide any evidence of individual actions by
Alaigh, Velez or Guhl that violated Plaintiffs' rights, the
Court will grant summary judgment in favor of Defendants as to
the Section 1983 claims against the individual defendants in
their personal capacity.

---

[2] Providence's CEO, Lozada, testified that Guhl might have walked
through the facility for the proposed expanded Camden site, but
she could not be sure that he was the representative who visited
the facility.  (Montanez Cert., Ex. G at 51:20-23, 52:25-53:4.)
She recalled only that it was a male representative of the DHSS,
but when told that Guhl was not employed by the DHSS, Lozada
testified that it must not have been Guhl who visited the
facility.  (Id.)

**D.   Counts I, II and III: Medicaid Claims**

In Count I, Plaintiffs contend that by accepting Medicaid funds from the federal government, the State of New Jersey became obligated to comply with a number of federal requirements.  (Compl. ¶ 186.)  Plaintiffs posit that the licensing and Medicaid regulations adopted by the State of New Jersey "place arbitrary and capricious requirements, restrictions, exclusions, and quantitative limits on necessary medical services," which thereby has the effect of denying medically necessary services to children in need.  (Id. ¶¶ 187-88.)  Plaintiffs also argue that Defendants' reimbursement rate creates an environment where providers are not financially able to provide services to Medicaid beneficiaries.  (Id. ¶ 191.)  In Count II, Plaintiffs contend that the Plaintiff-Children and other Medicaid recipients in Camden County and Atlantic County receive medical assistance that is less in amount, duration and scope than the medical assistance provided to Medicaid beneficiaries in other geographical areas.  (Id. ¶ 208.)  In Count III, Plaintiffs aver that Defendants failed to administer the Medicaid program in an efficient and effective manner in violation of 42 U.S.C. § 1396a(a)(30)(A).  (Id. ¶ 217.)

### 1. **Plaintiffs' Ability to Bring a Private Right of Action for Medicaid Violations**

Before turning to the merits of these claims, the Court must consider whether Plaintiffs can bring a claim for failure to comply with the Medicaid laws.  Plaintiffs argue that they may bring such a claim under Section 1983 and the Supremacy Clause.

The Supreme Court recently held that the Supremacy Clause does not provide a private right of action.  Armstrong v. Exceptional Child Center, Inc., --- U.S. ---, 135 S. Ct. 1378, 1383, 191 L. Ed. 2d 471 (2015).  In Armstrong, the Court stated that the Supremacy Clause is not the "'source of any federal rights,'" but rather "instructs courts what to do when state and federal law clash[.]" Id.[3]  The Court further noted that the Supremacy Clause "is silent regarding who may enforce federal laws in court, and in what circumstances they may do so." Id. The Court then addressed whether the suit could proceed under

---

[3] Plaintiffs argue that because the New Jersey regulations are inconsistent with federal Medicaid law, they are entitled to a declaration that the regulations are invalid.  (Pls.' Opp. Br. at 41.)  The Supreme Court in Armstrong clarified that a preemption argument does not create a private right of action. Once a case or controversy properly comes before a court, the court must at that time consider whether to enjoin the enforcement of state laws that are alleged to violate federal law.  Armstrong, 135 S. Ct. at 1384.  The Supremacy Clause does not, however, create a cause of action for its violation.  Id.

the federal courts' equitable power to enjoin unlawful executive action, specifically addressing § 30(A) of the Medicaid Act and concluding that the Medicaid Act precludes private enforcement of § 30(A) in the courts.  Id. at 1385.

Armstrong makes clear that Plaintiffs cannot bring their claims in Counts I, II and III through the Supremacy Clause. Moreover, Armstrong is dispositive of those claims based upon Defendants' alleged violations of § 30(A).  Because there is no private right of enforcement of § 30(A), judgment must be entered in favor of Defendants as to Count I to the extent Plaintiffs allege a violation of § 30(A) (see, e.g. Compl. ¶¶ 186(f), 187, 191-93), and Count III in its entirety, as this count is based solely on § 30(A).

The Court thus turns to whether Plaintiffs can bring their remaining Medicaid claims under Section 1983.[4]  "In legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 28, 101

---

[4] As noted above, in Armstrong, the Supreme Court also considered whether claims under the Medicaid act could be brought through the Court's equitable powers.  Plaintiffs here do not contend that their claims can proceed in equity and, accordingly, the Court finds any such argument waived.

S. Ct. 1531, 67 L. Ed. 2d 694 (1981).  However, the Third Circuit has held that individuals may bring a private right of action for some provisions of the Medicaid act, specifically finding that a private right of action exists under 42 U.S.C. §§ 1396a(a)(10), 1396d(a)(15), and 1396a(a)(8).  Sabree ex rel. Sabree v. Richman, 367 F.3d 180, 183 (3d Cir. 2004).  In reaching this conclusion, the Third Circuit conducted an analysis pursuant to the tri-partite test set forth in Blessing v. Freestone, 520 U.S. 329, 340, 117 S. Ct. 1353, 137 L. Ed. 2d 569 (1997).  The three factors that must be considered include (1) whether Congress intended the provision in question to benefit the plaintiff; (2) whether the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence, and (3) whether the statute unambiguously imposes a binding obligation on the States.  Blessing, 520 U.S. at 340-41, 117 S. Ct. 1353.[5] In addition to the text of the statute at issue, the Court must also consider the statute's structure to determine whether it is sufficiently rights-creating.  See Gonzaga Univ. v. Doe, 536

---

[5] "Although the Blessing analysis may appear straightforward, subsequent Supreme Court decisions have suggested that there are fine distinctions in its application, requiring us to look not only at the statutory text, but also to congressional intent." Grammer v. John J. Kane Reg'l Centers-Glen Hazel, 570 F.3d 520, 526 (3d Cir. 2009), cert. denied, 559 U.S. 939, 130 S. Ct. 1524, 176 L. Ed. 2d 113 (2010).

U.S. 273, 286, 122 S. Ct. 2268, 153 L. Ed. 2d 309 (2002); see also Sabree, 367 F.3d at 191.

Here, the complaint cites a litany of Medicaid statutory provisions and regulations that were purportedly violated by Defendants: 42 U.S.C. §§ 1396a(a)(3), 1396a(a)(8), 1396a(a)(10), 1396a(a)(30)(A), 1396a(a)(17), 1396a(a)(43), 1396d(a)(4)(B), 1396d(r), and 42 C.F.R. §§ 435.930, 440.230, 447.204, and 449.240. It is Plaintiffs' burden to establish that each of these provisions "gives rise to federal rights enforceable through § 1983." Grammer v. John J. Kane Reg'l Centers-Glen Hazel, 570 F.3d 520, 525 (3d Cir. 2009), cert. denied, 559 U.S. 939, 130 S. Ct. 1524, 176 L. Ed. 2d 113 (2010).

Plaintiffs do not specifically address whether each of the Medicaid statutes and regulations cited in the complaint individually pass the above-cited analysis and can therefore be enforced privately pursuant to § 1983. Plaintiffs cite cases that have recognized a private right of action for some of the Medicaid statutes at issue, including Sabree, which supports the Plaintiff-Children's right of action under 42 U.S.C. §§ 1396a(a)(8) and 1396a(a)(10), and Westside Mothers v. Olszewski, 454 F.3d 532 (6th Cir. 2006), which similarly found a private

26

right of action exists under §§ 1396a(a)(8) and 1396a(a)(10), as well as under 1396a(a)(43).[6]

The Court, therefore, will examine only the merits of the claims for violations of §§ 1396a(a)(8), 1396a(a)(10), and 1396a(a)(43), as Plaintiffs do not even attempt to articulate, let alone meet their burden of demonstrating, that they may bring a private right of action under any other Medicaid statute or regulation.  In addition, the Court notes that Plaintiffs cite no authority to support Providence's right, as a medical provider rather than a beneficiary of medical services, to assert any claims under the Medicaid Act.  (See Pls.' Opp. Br. 42) (arguing that Defendants "cannot challenge the fact that the Plaintiff Children are entitled to enforce the provisions of the Federal Medicaid Act through § 1983" but making no argument on behalf of Providence); see also Armstrong, 135 S. Ct. at 1387 ("We doubt, to begin with, that providers are intended beneficiaries (as opposed to mere incidental beneficiaries) of the Medicaid agreement, which was concluded for the benefit of the infirm whom the providers were to serve, rather than for the benefit of the providers themselves."); Mercer Cnty. Children's Med. Daycare, LLC v. O'Dowd, Civ. A. No. 13-1436, 2014 WL

_____

[6] The remaining cases cited by Plaintiffs pre-date Gonzaga and thus are not instructive on the issue of whether Plaintiffs may assert a private right of action under various provisions of the Medicaid Act.

27

546346, at *6 (D.N.J. Feb. 10, 2014) (distinguishing between right of plaintiff-health care provider and plaintiff-children to bring claims under Medicaid statutes based upon whether statutes were intended to benefit provider or beneficiary).

Because Plaintiffs fail to demonstrate that Providence may bring a private right of action under the Medicaid Act, judgment will be entered in Defendants' favor with respect to Providence's claims in Counts I, II and III.  Additionally, judgment will be entered in Defendants' favor with respect to the Plaintiff-Children's claims in Count I for violations of 42 U.S.C. §§ 1396a(a)(3), 1396a(a)(30)(A), 1396a(a)(17), 1396d(a)(4)(B), 1396d(r), and 42 C.F.R. §§ 435.930, 440.230, 447.204, and 449.240.  Judgment will also be entered in favor of Defendants on Plaintiff-Children's claims in Count III.

### 2. Merits of Plaintiff-Children's Claims for Violations of 42 U.S.C. §§ 1396a(a)(8), 1396a(a)(10), and 1396a(a)(43)

Under 42 U.S.C. § 1396a(a)(8), a State plan for medical assistance must provide medical assistance under the plan with reasonable promptness to all eligible individuals.  It appears that the crux of Plaintiffs' claim with respect to this provision is that because of the twenty-seven slot limit and the moratorium, medically qualified children who have sought treatment at Providence's facilities have been put on waiting lists and have therefore not received services with "reasonable

promptness." (See Compl. ¶¶ 8, 9, 11.)  However, it is
undisputed that each of the Plaintiff-Children was enrolled at
Providence and, therefore, none of them was denied a spot in the
facility.  (See Defs.' SOF ¶¶ 44, 48, 52, 59, 63, 68.)
Moreover, there is no evidence in the record demonstrating that
any of the Plaintiff-Children were placed on a wait list before
being enrolled at Providence.  Plaintiffs therefore fail to meet
their burden of demonstrating that there is a factual dispute as
to whether the Plaintiff-Children received medical assistance
with "reasonable promptness."  Accordingly, Defendants are
entitled to judgment in their favor to the extent Count I
asserts a claim on behalf of the Plaintiff-Children for a
violation of § 1396a(a)(8).

Under 42 U.S.C. § 1396a(a)(10)(B), a State plan for medical
assistance must provide medical assistance for eligible
individuals that is not less in amount, duration, or scope than
the medical assistance made available to any other Medicaid
beneficiaries or other individuals who receive medical
assistance.  Plaintiffs aver that this statute was violated
because (1) the Plaintiff-Children and other children in Camden
County and Atlantic County receive less medical assistance than
children in other counties, and (2) the Plaintiff-Children, once
discharged from Providence, have been unable to receive similar
services at regular day care centers.  (Compl. ¶¶ 208-09.)

Focusing on Plaintiffs' first theory, the basis of this claim appears to be that if Defendants had granted Providence's 2003 applications for expansion of the Camden facility and approval of a Berlin facility, then Providence would have been able to provide PMDC services in Atlantic County and Camden County to more than one hundred additional children.  At the same time Defendants thwarted Providence's efforts to create additional slots, they approved the requests of facilities in other counties to create additional slots for PMDC services. Plaintiffs thus contend that PMDC services are more readily available to eligible children in other counties in New Jersey.

The record is devoid of comparative evidence concerning the amount, duration or scope of assistance provided to Medicaid beneficiaries or individuals in any other county.  As noted above, each of the Plaintiff-Children was admitted to Providence and received PMDC services, and there is no evidence that any of the Plaintiff-Children was placed on a wait list prior to their admission to Providence.  Even assuming arguendo that there were fewer spots for PMDC services in Camden and Atlantic Counties than elsewhere in the State, these Plaintiffs have not demonstrated that they received less medical assistance than individuals in other counties.  Because there is no evidence that the medical assistance provided in other counties exceeded the care provided to Plaintiffs, the Plaintiff-Children fail to

show that they suffered unequal treatment when compared to care provided to children in other counties.

With respect to Plaintiffs' second theory, Plaintiffs do not present sufficient evidence to demonstrate that the Plaintiff-Children have been unable to receive services similar to or equal to the services that were provided to them at Providence.[7]  The Court first notes that of the six individual plaintiffs, it is undisputed that three of the children -- N.M., C.T., and T.B. -- were never discharged from Providence and either graduated or aged out of the program.  These three plaintiffs cannot demonstrate that they received lesser care than had been provided at Providence when Providence provided them care until they began kindergarten.

As to the remaining three plaintiffs, one of the Plaintiff-Children who left Providence before graduation, Z.N., left because of her mother's personal circumstances.  Z.N.'s mother testified that Z.N. stopped attending Providence because her

_____

[7] Relatedly, Plaintiffs refer to twins, N.W. and N.W., who both had asthma and appeared to suffer from the same symptoms, but only one of whom was determined to be eligible for PMDC services.  (Pls.' Opp. Br. 23.)  Neither of the twins, however, is a plaintiff in this matter, and the claims in this case are only brought by the individual plaintiffs on their own behalf and not on behalf of any other children.  The alleged disparate treatment of N.W. and N.W. does not demonstrate that the named plaintiffs in this case received medical assistance less in amount, duration, or scope than the medical assistance made available to others.

schedule changed and it became difficult for her to transport
Z.N. back and forth to Providence.  (Kennedy Cert., Ex. Q at
26:7-28:6.)  Z.N.'s mother therefore initiated Z.N.'s withdrawal
from Providence for her own personal reasons, and any failure to
receive equal care from another facility -- to the extent there
was such failure -- was not due to any of the regulations at
issue in this case.  Z.N. has not demonstrated that she received
unequal treatment and comparable care because of any conduct by
Defendants.

Another of the Plaintiff-Children, J.M., was also withdrawn
voluntarily from Providence.  J.M.'s mother testified that she
had received a discharge notice because J.M. was no longer
clinically eligible for PMDC services.  (Kennedy Cert., Ex. R at
31:2-14.)  Although the record does not contain an abundance of
evidence on the issue, J.M.'s only medical condition was asthma,
and it appears that J.M. was initially eligible for PMDC
services under prior State regulations but his condition was
deemed not sufficiently severe under the State's new
regulations.  Providence appealed that decision, and J.M. was
entitled to remain at Providence during the pendency of the
appeal.  (Id. at 49:1-5.)  Nonetheless, J.M.'s mother decided to
withdraw J.M. from Providence without having received a decision
on the appeal, and without having enrolled him in another
daycare program, because she was concerned about having a lack

32

of child care.  (Id. at 31:2-32:2.)  Any failure of J.M. to
receive medical assistance after leaving Providence was,
therefore, the result of a voluntary decision by J.M.'s mother.

The final plaintiff, J.B., also suffered from asthma and
was discharged from Providence after it was determined that her
condition was not sufficiently severe to qualify for PMDC
services.  However, J.B.'s mother testified that J.B. was
thereafter enrolled in Respond Daycare, which is a regular
daycare, and there is no evidence that the medical assistance
that J.B. received at Respond was inferior to the care she
received at Providence.  J.B.'s mother stated that Respond has
J.B.'s medications, which are administered by the school nurse.
(Kennedy Cert., Ex. S at 34:4-13.)  While she has had to take
J.B. from Respond to the pediatrician when J.B. began wheezing
and coughing, she was similarly called by Providence and was
asked take J.B. to the pediatrician to address the asthma issue
when J.B. was enrolled at Providence.  (Id. at 34:20-35:13.)  In
the absence of any evidence to demonstrate that J.B. did not
receive inferior medical assistance at Respond, J.B. fails to
support her claim under § 1396a(a)(10).

In sum, there is no evidence to support the Plaintiff-
Children's contention that they received medical assistance that
was less in amount, duration or scope than others due to
Defendants' enactment of the regulations at issue in this case.

Defendants are entitled to summary judgment to the extent Count I asserts a claim on behalf of the Plaintiff-Children for a violation of § 1396a(a)(10)(B).

Finally, 42 U.S.C. § 1396a(a)(43) requires a State plan for medical assistance to provide "all persons in the State who are under the age of 21 and who have been determined to be eligible for medical assistance . . . of the availability of early and periodic screening, diagnostic, and treatment services," as well as to provide such screening services when requested and corrective treatment.  As discussed above, there is no evidence in the record concerning the services or treatment that were provided to the Plaintiff-Children.  The Court cannot therefore conclude that Defendants failed to provide the Plaintiff-Children with the required EPSDT services under the Medicaid statute.  As such, summary judgment will also be granted in favor of Defendants to the extent Count I alleges a violation of § 1396a(a)(43).

**E.  Counts IV and V: Equal Protection and Due Process**

**1.  Res Judicata**

Defendants contend that Plaintiffs' claims for equal protection and due process violations are barred because Plaintiffs already litigated such claims in the administrative proceeding.  Plaintiffs argue that their claims are not barred for a number of reasons, including that new facts and

34

circumstances came to light after the close of the administrative proceeding, that there was a different burden of proof at the administrative level, and that there is a need for a new determination of the issues.

Res judicata bars a party from initiating a subsequent suit against the same adversary based on the same cause of action as a prior suit. Duhaney v. Att'y Gen., 621 F.3d 340, 347 (3d Cir. 2010), cert. denied, --- U.S. ---, 131 S. Ct. 2961, 180 L. Ed. 2d 250 (2011). The purpose of res judicata is to "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." Allen v. McCurry, 449 U.S. 90, 94, 101 S. Ct. 411, 66 L. Ed. 2d 308 (1980).

The parties do not dispute that an administrative agency's findings may be given preclusive effect, but the Court does not find the issue quite so clear. In B & B Hardware, Inc. v. Hargis Indus., Inc., --- U.S. ---, 135 S. Ct. 1293, 1303, 191 L. Ed. 2d 222 (2015), the Supreme Court recently stated that "where a single issue is before a court and an administrative agency, preclusion also often applies." However, in using the term "often," the Supreme Court made clear that preclusion does not necessarily always apply. The Court concluded in B & B Hardware that preclusion applies "in those situations in which Congress has authorized agencies to resolve disputes, [as] 'courts may

take it as given that Congress has legislated with the expectation that the principle [of issue preclusion] will apply except when a statutory purpose to the contrary is evident.'" Id. (internal citation omitted).  Here, review of the State's decision by an administrative agency was not authorized by Congress and, as such, the Court cannot presume that preclusion applies.

The Third Circuit has recognized that "applying preclusive effect to legal conclusions made by state agencies 'is favored as a matter of general policy, [though] its suitability may vary according to the specific context of the rights at stake, the power of the agency, and the relative adequacy of agency procedures.'"  Crossroads Cogeneration Corp. v. Orange & Rockland Util., Inc., 159 F.3d 129, 135 (3d Cir. 1998) (quoting Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 109-10, 111 S. Ct. 2166, 115 L. Ed. 2d 96 (1991)).  No party has addressed these factors to demonstrate that the agency decision has preclusive effect in this case.  The Court, consequently, rejects Defendants' argument that that the administrative decision should be given preclusive effect so as to bar Plaintiffs' claims in this case.

## 2.  Equal Protection Claims

The Fourteenth Amendment to the United States Constitution provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  To prevail on an equal protection claim, a plaintiff must allege that he or she "has been treated differently from persons who are similarly situated." Renchenski v. Williams, 622 F.3d 315, 337 (3d Cir. 2010), cert. denied, --- U.S. ---, 131 S. Ct. 2100, 179 L. Ed. 2d 926 (2011). Ultimately, "[i]f state action does not burden a fundamental Constitutional right or target a suspect class, the challenged classification must be upheld if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."  Id. (quoting Doe v. Pa. Bd. of Prob. & Parole, 513 F.3d 95, 107 (3d Cir. 2008)).

### a. Providence's Equal Protection Claim

Providence argues that the Department (1) selectively enforced the twenty-seven student limit as to Providence but allowed other facilities -- including one in Mercer County -- to exceed the cap, and (2) approved other facilities' applications to open PMDC facilities after the moratorium was entered while denying Providence's applications because of the moratorium. Another aspect of Providence's equal protection claim is that the twenty-seven student limit applies only to PMDC facilities

37

that accept Medicaid children, but PMDC facilities that do not accept Medicaid children are not subject to this cap.

The Court addresses the last argument first.  Defendants represent that all PMDC providers, regardless of whether they are Medicaid providers or not, are subject to the requirement that they maintain an average daily census of twenty-seven. (Defs.' Br. 27.)  Plaintiffs do not dispute this argument.  The applicable regulation, N.J.A.C. 8:43J-2.3, which sets forth the licensure requirements for PMDC facilities, provides that "[a] facility shall be licensed for a maximum of 27 slots."  The regulation does not contain any distinction between PMDC facilities that accept Medicaid children and those that do not. Accordingly, Defendants are entitled to summary judgment on Count IV to the extent Providence's equal protection claim is based on allegedly disparate requirements between PMDC facilities that accept Medicaid children and those that do not.

As to Plaintiffs' contention that other facilities were allowed to accommodate more than twenty-seven students, the evidence in the record demonstrates that the only facility which was permitted to operate with two twenty-seven slot licenses was not similarly situated to Providence.  Goldman testified that the other facility at issue, Millhouse, submitted an application for a seventy bed facility in 2002, and such application was approved before the Department decided to enforce compliance

with the twenty-seven student limitation. (Kennedy Cert., Ex. J
at 63:1-13.) Millhouse had already entered into a lease and
began construction on the facility when the DHSS decided to
enforce the limitation. (Id. at 63:4-6.) Because Millhouse was
so far along in the process, it asked the Department to issue a
"split" license, thereby creating in essence two separate
facilities, which request was approved by the Department. (Id.
at 65:7-13, 67:19-23.)

     Providence, by contrast, had not received approval for more
than twenty-seven slots at the time the Department decided to
enforce the regulation. Further, there is no evidence that
Providence began construction on the expansion, and thus did not
incur the same level of costs as Millhouse, in reliance on a
prior approval for a facility that had more than twenty-seven
slots. Providence also never requested that a "split" license
be issued, whereas Millhouse specifically made such request.
(Id. at 67:11-17.) Under these circumstances, Providence fails
to present evidence that it was similarly situated to Millhouse.
This aspect of the equal protection claim is thus subject to
judgment in favor of Defendants.

     On the issue of approving some facilities during the
moratorium while rejecting Providence's applications, Defendants
do not dispute that licenses were issued during the moratorium
for new or expanded PMDC facilities, but they contend that the

39

only licenses that were issued were for applications that had
been received by the DHSS before the moratorium was issued on
November 3, 2003.  (Defs.' SOF ¶ 36.)  According to Defendants,
Providence's applications were denied because they were not
submitted until November 13, 2003.  (Id. ¶ 33.)  In an effort to
show unequal treatment, Plaintiffs point to two facilities,
Millhouse and Weisman, whose applications were purportedly
submitted after the moratorium but were nonetheless granted
approval.  (Pls.' Supp. SOF ¶¶ 48, 50.)

   The Court agrees with Plaintiffs that there is a dispute of
fact on the issue of whether Providence was similarly situated
to Millhouse or Weisman.  The license application for Millhouse
is dated December 3, 2004.  (Montanez Cert., Ex. J.)  The
application for Weisman is dated September 26, 2006.  (Montanez
Cert., Ex. L.)  Clearly, these applications were filed after the
moratorium became effective on November 3, 2003.

   Defendants explain that although the license applications
were not submitted until after the moratorium, the application
process was initiated by Millhouse and Weisman in 2002 and 2003,
respectively.  (Defs.' SOF ¶ 36.)  In support of this assertion,
Defendants do not submit the initial applications but instead
refer to the deposition testimony of Barbara Goldman.  At
Goldman's deposition, she reviewed a letter dated September 15,
2004 from Conroy, Assistant Commissioner of the DHSS, which

stated that there was prior approval on December 13, 2002 to
establish a 60-slot facility at "The Millhouse in Mercer County"
and that "these approvals were reduced to 27 slots each, due to
subsequent Departmental administrative action[.]"   (Kennedy
Cert., Ex. J at 93:23-94:19.)   Goldman also reviewed a February
2006 letter concerning Weisman's application, which states that
the application "was initially submitted June 9, 2003 to be
located in Camden, however, you have requested to change the
location to Pennsauken."   (Id. at 97:18-21.)

        It appears from the letters cited in the Goldman deposition
that Millhouse and Weisman were farther in the application
process prior to the moratorium, their applications having
already received preliminary approval, whereas Providence had
only just begun the application process and had not received
even preliminary approval when the moratorium began.   However,
it remains undisputed that Providence had submitted an
application for expansion of the Camden facility prior to the
moratorium, and there are facts to suggest that it also began
the application process for approval of the new Berlin facility
prior to the moratorium.[8]   Although the application for the

---

[8] Providence's letter submitting the application for the Berlin
facility states that "[t]he floor plans were submitted to Mr.
Bill Beyer at the Department of Health on September 2, 2003, for
the state's preliminary approval.   The preliminary approval was
received on September 5, 2003."   (Montanez Cert., Ex. C.)   While
a Providence agent conceded in an email that Providence "missed

Camden facility was returned, and although Providence did not

formally submit a project narrative for the Berlin facility

until after the moratorium, a trier of fact must decide whether,

under the circumstances, Providence's conduct constituted

initiation of the application process for both the Camden and

Berlin facilities prior to the moratorium.[9]   If Providence is

deemed to have started the application process prior to the

moratorium, then it would have been similarly situated to

Millhouse and Weisman, but was treated differently.

Defendants conclusively assert that they did not

intentionally treat Providence differently than any other

facility, but they provide no evidence on this point.  (Defs.'

Opp. Br. 28.)   In addition, Defendants contend that there is a

rational basis for the twenty-seven daily student limitation and

---

the deadline by 10 days," she further indicated hope that the
interaction between Providence's architect and Beyer would serve
as "informal notice of our impending license application to
prevent the moratorium from affecting our Berlin project."
(Kennedy Cert., Ex. I.)

[9] The Court finds it especially noteworthy that after receiving
approval for a Camden facility, Weisman decided to change the
location of its facility, which presumably required Weisman to
essentially begin the process anew by submission of an entirely
new floorplan and new architectural plans.  Rather than require
Weisman to file a new application for the Pennsauken facility,
however, Weisman's application was deemed timely because its
initial application was filed prior to the moratorium.  By
contrast, Providence was not given the opportunity to merely
submit revised plans in connection with its September 2003
application; it was made to file an entirely new application,
which was then deemed untimely.

for the moratorium, but Defendants' focus is misplaced.  The relevant inquiry is whether Defendants had a rational basis for selectively enforcing the moratorium as to Providence but not as to Millhouse or Weisman.  Defendants do not cite any rational basis for the difference in treatment.  The Court therefore concludes at this time that Defendants fail to meet their burden of demonstrating that summary judgment is warranted to the extent that Count IV asserts an equal protection claim under the Fourteenth Amendment predicated on the unequal treatment of applicants during the moratorium.

### b.   Plaintiff-Children's Equal Protection Claim

The basis of the Plaintiff-Children's equal protection claim in Count IV is identical to their Medicaid claim in Count II, which is addressed in detail above.  In Count IV, Plaintiffs allege that "[t]he medical assistance made available by Defendants to Plaintiff-children and other Medicaid recipients in Atlantic County and Camden County are less in amount, duration, and scope that [sic] the medical assistance made available to Medicaid beneficiaries and other individuals in other geographical areas, such as Mercer County in violation of 42 U.S.C. § 1396a(a)(10)(B), 42 C.F.R. §§440.230 and 440.240."  (Compl. ¶ 228.)  As discussed supra, there has been no showing that the Plaintiff-Children received medical assistance less in

43

amount, duration or scope than the medical assistance provided
to individuals in other geographic areas.  Indeed, there are no
facts concerning any level of assistance provided in other
counties, which thereby precludes a comparative analysis.
Defendants will be granted summary judgment on the Plaintiff-
Children's equal protection claim in Count IV.

### 3.    Procedural Due Process

In Count V, Plaintiffs allege a violation of the Due
Process Clause of the Fourteenth Amendment, pursuant to 42
U.S.C. § 1983.  To succeed on a claim for deprivation of
procedural due process rights under Section 1983, a plaintiff
must show (1) that he was deprived of an individual interest of
life, liberty or property encompassed within the Fourteenth
Amendment; and (2) the procedures used by the state to effect
this deprivation were constitutionally inadequate.  Hill v.
Borough of Kutztown, 455 F.3d 225, 234 (3d Cir. 2006).

With respect to Providence, the parties vehemently dispute
whether Providence has a property interest sufficient to meet
the first prong.  However, even assuming that Providence was
deprived of a property interest, Providence makes no argument
concerning a deficiency in process.  Providence asserts in
conclusory fashion that Defendants imposed a twenty-seven slot
licensing cap on Providence without notice or an opportunity to
be heard.  (Pls.' Opp. Br. 39.)  Similarly, Providence contends

44

that Defendants imposed the moratorium on November 3, 2003
without notice or an opportunity to be heard.  (Id.)

    The "fundamental requirement of due process is the
opportunity to be heard at a meaningful time and in a meaningful
manner." Sea Girt Rest. & Tavern Owners Ass'n, Inc. v. Borough
of Sea Girt, 625 F. Supp. 1482, 1489 (D.N.J. 1986), aff'd, 802
F.2d 445 (3d Cir. 1986).  A state "provides constitutionally
adequate procedural due process when it provides reasonable
remedies to rectify a legal error by a local administrative
body." DeBlasio v. Zoning Bd. of Adjustment, 53 F.3d 592, 597
(3d Cir. 1995), abrogated on other grounds by United Artists
Theatre Circuit, Inc. v. Twp. of Warrington, 316 F.3d 392, 400
(3d Cir. 2003).  Thus, "when a state affords a full judicial
mechanism with which to challenge the administrative decision in
question, the state provides adequate procedural due process . .
. whether or not the plaintiff avails him or herself of the
provided appeal mechanism." Id. (citations and internal
quotations omitted).

    The New Jersey regulations provided Providence with an
opportunity to challenge the administrative decisions.
Specifically, N.J.A.C. 10:166-2.4 states that "[a] PMDC facility
wishing to contest decisions made by the Department . . . may
request a fair hearing by submitting a request therefor,
pursuant to the Medicaid Administration Manual and the Uniform

Administrative Procedure Rules, N.J.A.C. 1:1."  In light of this
process, and without any indication that such process is
deficient, Providence's procedural due process claim fails.  See
Mercer Cnty. Childrens Medical Daycare, 2014 WL 546346, at *9
(dismissing procedural due process claim in light of
administrative appeal procedures).

Moreover, to the extent Plaintiffs believe that the
Department should have engaged in pre-deprivation notice-and-
comment rulemaking, the Third Circuit has concluded that "[t]he
Due Process Clause does not require a state agency to engage in
notice-and-comment rulemaking."  New Jersey Primary Care Ass'n
Inc. v. New Jersey Dept. of Human Serv., 722 F.3d 527, 537 (3d
Cir. 2013) (citing Tenny v. Blagojevich, 659 F.3d 578, 582 (7th
Cir. 2011) ("The plaintiffs suggest that some sort of notice-
and-comment rulemaking might satisfy constitutional due process.
The prospect of a federal court ordering a state to create such
a procedure risks turning procedural due process into a
constitutionally mandated state administrative procedure
act.")).

As to the Plaintiff-Children, Plaintiffs do not argue that
they have a property interest and, as such, fail to demonstrate
that they can assert a procedural due process claim.
Furthermore, even if they had a property interest, they too have
a procedure for challenging decisions made by the Department of

46

Health.  Specifically, N.J.A.C. 10:166-3.5 provides that "[a] Medicaid beneficiary may appeal a determination of clinical ineligibility made by the Division."

Plaintiffs have consequently failed to demonstrate that they were denied procedural due process, and summary judgment will be entered in Defendants' favor to the extent Count V asserts a procedural due process claim.

### 4.   Substantive Due Process

Lastly, the Court turns to the substantive due process claims in Count V.  To state a substantive due process claim under the Fourteenth Amendment, a plaintiff must allege that the government deprived him of a fundamental property interest under the Constitution with conduct that "shocks the conscience." Chainey v. Street, 523 F.3d 200, 219 (3d Cir. 2008).  "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."  Cnty. of Sacramento v. Lewis, 523 U.S. 833, 849, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998).

Plaintiffs do not present any evidence from which a jury could reasonably find that Defendants engaged in the sort of egregious conduct that would "shock the conscience."  Rather, both the decision to enforce the twenty-seven student cap and to issue the moratorium serve governmental purposes and do not shock the conscience.

The Notice of Moratorium explains why Defendants decided, in 2003, to begin enforcing the twenty-seven student cap when such cap had already existed in the regulations for nearly a decade.  The Notice states that in February 2003, the Office of Legislative Services issued an Audit Report concerning the Medical Daycare industry in New Jersey.  (Kennedy Cert., Ex. F.) The Audit Report identified issues related to PMDC services, including capacity limitations for PMDC facilities.  (Id.)  As stated in the November 6, 2003 memorandum from Conroy, the DHSS recognized that it had "erroneously granted" approval for facilities with more than twenty-seven slots in "direct violation" of the New Jersey regulations.  (Kennedy Cert., Ex. E.)  Accordingly, it required facilities to come into compliance with the regulation through the process of attrition.  "In order to prevent the displacement of any pediatric participants who currently attend" PMDC facilities, however, no child was to be disenrolled in the system.  (Id.)  Instead, as children were discharged from the facilities, facilities were not to allow any new admissions.  (Id.)

Despite these legitimate and rational explanations, Plaintiffs "allege[] that from 2003 through 2009, Defendants arbitrarily and selectively imposed and enforced a non-existent 27-child cap, as an impermissible licensing restriction." (Pls.' Opp. Br. 30.)  Plaintiffs, however, must do more than

48

"allege" wrongdoing to overcome summary judgment.  Contrary to Plaintiffs' assertions of a "non-existent" cap, the record demonstrates that the twenty-seven cap limit was contained in New Jersey regulations since 1994.  Moreover, the record only demonstrates that one PMDC facility, Millhouse, was granted more than twenty-seven slots, and Defendants have provided an explanation for this decision as discussed in detail above.  Plaintiffs have not presented any evidence that Defendants acted in an arbitrary or irrational manner, let alone conduct that "shocks the conscience," with respect to the decision to enforce the twenty-seven student limitation.

As for the moratorium, Defendants have also demonstrated that the moratorium served legitimate governmental purposes.  In addition to issues with capacity limitations, the Audit Report identified issues with criminal background investigations of owners and staff of PMDC facilities, increased oversight of the PMDC industry, and clarity of State eligibility requirements for participants.  (Kennedy Cert., Ex. F.)  Furthermore, the moratorium was entered in response to an "overwhelming" number of pediatric day health care facility licensure applications and the need for the DHSS to promulgate regulations that "prevent the proliferation" of PMDC facilities with deficient policy practices.  (Id.)

The Notice of Moratorium explained that in light of recent review by the DHSS of PMDC facilities, it was determined that the Department's licensure regulations and Medicaid eligibility criteria required revision, and the DHSS was conducting a study of PMDC services and would be proposing amendments of the pediatric rules.  (Id.)  As stated in the Notice, "[t]he pediatric day health care participant population's interest are best served through the thorough and efficient review of [PMDC] service delivery in New Jersey and the promulgation of rules governing licensing standards, eligibility criteria and the Department's survey and enforcement activity."  (Id.)

While Plaintiffs contend that the "selective enforcement" of the moratorium violated their substantive due process rights, there is no evidence to support this assertion.  The Court already concluded that there is a question of fact as to whether Providence was treated differently than other PMDC providers, but Plaintiffs cite no evidence to demonstrate that such selective enforcement was prompted by motives that "shock the conscience."  See MARJAC, LLC v. Trenk, 380 F. App'x 142, 147 (3d Cir. 2010) ("Depending on the gravity, context, and surrounding circumstances, selective enforcement motivated by ethnic bias may constitute arbitrary conduct capable of shocking the conscience.").

50

Finally, Plaintiffs "allege that the regulations, by design, and by Defendants' interpretation, will result in utter chaos, as a child may qualify on Monday, and be subject to discharge on Tuesday, and then qualify again on Wednesday, and so on," which has purportedly "led to an environment . . . that has no rational relationship to the medical condition of the children in which Defendants are charged with protecting." (Pls.' Opp. Br. 28.)  Again, Plaintiffs must do more than rely on their allegations at the summary judgment stage.  Plaintiffs present no evidence that the regulations, or Defendants' interpretations thereof, have created the "chaos" feared by Plaintiffs.

Because Plaintiffs fail to demonstrate any conduct by Defendants that "shocks the conscience," judgment will be entered in favor of Defendants to the extent Count V asserts a claim for a violation of substantive due process.

## IV.   <u>CONCLUSION</u>

In sum, the Court will grant summary judgment on all counts in favor of Defendants the New Jersey Department of Health and Senior Services, the New Jersey Department of Human Services, and the Division of Medical Assistance and Health Services. Defendants will also be granted summary judgment in their favor on all claims against Alaigh, Velez and Guhl in their personal capacities, and against these individual defendants in their

official capacities, except to the extent Plaintiffs seek prospective injunctive and declaratory relief.  Further, the Court will enter summary judgment as to the official capacity claims against the individual defendants on Counts I, II, III, and V, and the only claim that will be permitted to proceed is Providence's claim in Count IV that Defendants selectively enforced the moratorium.  Finally, Defendants will be granted summary judgment as to all claims asserted by the Plaintiff-Children.

An Order consistent with this Opinion will be entered.


                                    s/ Noel L. Hillman
                                NOEL L. HILLMAN, U.S.D.J.

Date: June 30, 2015

At Camden, New Jersey